UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO:

CHRISTOPHER BENSON,

      Plaintiff,

v.

PRISONER TRANSPORTATION SERVICES,
INC. f/k/a PRISONER TRANSPORTATION
SERVICES, LLC; PTS OF AMERICA, LLC;
BREVARD EXTRADITIONS, LLC; U.S.
CORRECTIONS, LLC, and JOHN DOE #1
AND JOHN DOE #2,

      Defendants.

_____ /

**COMPLAINT FOR DAMAGES**
**(Jury Trial Demanded)**

David A. Frankel, Esquire
**Law Offices of David A. Frankel, P.A.**
4601 Sheridan Street, Suite 213
Hollywood, FL 33021
(954) 683-0300
Fla. Bar Number 741779
david@BlueLotusLaw.com
service@BlueLotusLaw.com

*Attorney for Christopher Benson*

1

Plaintiff, CHRISTOPHER BENSON ("Benson" or "Plaintiff") sues the Defendants, PRISONER TRANSPORTATION SERVICES, INC, f/k/a PRISONER TRANSPORTATION SERVICES, LLC, BREVARD EXTRADITIONS, LLC, U.S. CORRECTIONS, LLC, PTS OF AMERICA, LLC, JOHN DOE #1, and JOHN DOE #2, jointly and severally, and states the following:

## JURISDICTION AND VENUE

1.     This action is brought by Plaintiff against a private prisoner transport company, PRISONER TRANSPORTATION SERVICES, INC f/k/a PRISONER TRANSPORTATION SERVICES, LLC, and its three subsidiary companies (the three subsidiaries are collectively referred to here, along with the parent company, as "PTS" or "PTS Defendants" or "corporate Defendants") and two individuals who were agents of PTS, pursuant to the state tort laws of the State of Wisconsin and 42 U.S.C. §§1983, 1988, and the Eighth and Fourteenth Amendments to the United States Constitution. Jurisdiction is founded on 28 U.S.C. §§1331, 1343, 42 U.S.C. §1988, the constitutional provisions mentioned above, and under the state tort laws of Wisconsin. Supplemental jurisdiction and joinder of parties for state law claims are proper pursuant to 28 U.S.C. §1367(a) because they form part of the *same case or controversy*.

2.     Venue is proper in this Court because the violations of civil rights alleged are transitory in nature, and the Defendants do not all reside in one state.   PRISONER TRANSPORTATION SERVICES, INC, f/k/a PRISONER TRANSPORTATION SERVICES, LLC and its three subsidiary companies are subject to personal jurisdiction in the Southern District of Florida because they act as one company regularly doing business in the Southern District of Florida.

**INTRODUCTION**

3.        Over the course of five days, between July 20 and July 25, 2018, the Plaintiff was subjected to dangerous and inhumane conditions of confinement while transported in the Defendants' custody from the New Hampshire State Prison ("NHSP") to the Wood County, Wisconsin Jail.  During that time, the Plaintiff was crammed into a cage, shackled at the ankles, hands, and waist.  Denied adequate use of a toilet, the Plaintiff held his bodily functions for the entire time, resulting in serious medical complications.  Other prisoners in the van could not hold their bowels and the Plaintiff was forced to stay confined in human filth.  Deprived of sleep, ability to move, and adequate light, the Plaintiff became disoriented, anxious, and emotionally traumatized.  The van itself leaked transmission fluid, causing noxious fumes to permeate the prisoners' compartment, causing the Plaintiff and other prisoners headaches and difficulty in breathing.  When prisoners complained, the agents took them on rough rides as retaliation to frighten them into silence.

4.        The conditions suffered by the Plaintiff and other prisoners were a direct result of PTS policies that tolerate inhumane conditions of confinement.  PTS prioritizes its profits over the wellbeing and safety of the prisoners in its custody, as well as its agents, resulting in a widespread and continuous pattern of death and injury.

**PARTIES TO THE LAWSUIT**

5.        The Plaintiff, CHRISTOPHER BENSON, is a state sentenced prisoner residing at the Jackson Correctional Institution in Wisconsin Rapids, Wisconsin, and is otherwise *sui juris*.

6.        Corporate Defendant, PRISONER TRANSPORTATION SERVICES, INC. f/k/a PRISONER TRANSPORTATION SERVICES, LLC, is a private for-profit corporation doing business across the United States contracting with state and local governments, correctional

facilities, and law enforcement agencies to transport arrestees and incarcerated prisoners across jurisdictional lines.

7.      To transport prisoners and detainees, PRISONER TRANSPORTATION SERVICES, INC, f/k/a PRISONER TRANSPORTATION SERVICES, LLC is granted the power of arrest by the governmental agencies that contract for its services.  As such, PRISONER TRANSPORTATION SERVICES, INC, f/k/a PRISONER TRANSPORTATION SERVICES, LLC is the equivalent of a government body acting under the color of law and subject to liability under 42 U.S.C. § 1983, as well as each state in which it operates.

8.      BREVARD EXTRADITIONS, LLC, is one of three subsidiaries owned and operated by PTS INC as one company.  For purposes of incorporation, BREVARD EXTRADITIONS, LLC is registered in Florida and routinely does business in Florida.

9.      U.S. CORRECTIONS, LLC, is one of three subsidiaries owned and operated by PTS, INC as one company.  For purposes of incorporation, U.S. CORRECTIONS, LLC is registered in North Carolina and routinely does business in Florida.

10.      PTS OF AMERICA, LLC is one of three subsidiaries owned and operated by PTS INC as one company.  For purposes of incorporation, PTS OF AMERICA, LLC is registered in Tennessee and routinely does business in Florida.

11.      BREVARD EXTRADITIONS, LLC, U.S. CORRECTIONS, LLC, and PTS OF AMERICA, LLC are subsidiary companies held and managed by PRISONER TRANSPORTATION SERVICES, INC, f/k/a PRISONER TRANSPORTATION SERVICES, LLC.  Although maintaining separate names, the three subsidiaries are operated as one company without distinction in management, policies, and operations.

12.      John Does #1 and #2 were transportation agents employed by PTS and were the agents who performed Plaintiff's transportation from Keene County, New Hampshire to Wood County, Wisconsin.

## **GENERAL ALLEGATIONS**

13.      The Plaintiff alleges, and intends to prove, that at all times material hereto, PTS corporate Defendants, acting under the color of law, knowingly and purposely engaged in customs and practices that had the force of official policy, which were deliberately indifferent to the safety and wellbeing of the prisoners in their custody over whom they have complete control.

14.      The Plaintiff alleges, and intends to prove, that at all times material hereto, PTS exploited a lack of governmental regulation and/or lack of meaningful governmental oversight to infringe upon the constitutional rights guaranteed to the prisoners in their custody and to violate tort laws, for the sake of profit.   Further, PTS does not perform transportation of prisoners in any manner similar to, or acceptable by, the official government agencies upon whose behalf they operate.  Instead, PTS knowingly operates in a cruel and horrific manner, forcing prisoners to endure inhumane conditions of confinement.

15.      PTS's normal business operations depend upon its unfettered ability to exploit the inherent vulnerabilities of the prisoners in their custody who are held isolated from the world in cages, without the ability to communicate with family or friends for days or weeks at a time, and unable to complain or defend themselves without retaliation.

16.      The Defendants have each, as more fully set forth below, engaged in conduct that violates the Eighth Amendment and state tort laws purposely and deliberately refusing to provide for the Plaintiff's basic human need for sleep; the use of a bathroom: hygiene; fresh air; comfort and wellbeing; sanitation; food; water; and medical treatment and prescribed medications.

**Policies, Customs and Practices of Inhumane Treatment**

17.     The PTS corporate Defendants are paid on a "per prisoner/per transport" basis and as a matter of routine, seek to maximize the number of prisoners transported during each trip to make each trip as profitable as possible.

18.     This practice extends individual routes for unreasonable amounts of time, causing unsanitary and cramped conditions inside the vans that place the prisoners at increased risk of injury and emotional distress.

19.     The transportation vans used by PTS Defendants are outfitted with interior cages that resemble those used to control animals and were never designed or intended for long-distance human travel.

20.     The vans have no windows or blacked-out windows and prisoners are left in complete darkness for days at a time.

21.     The vans often do not have proper ventilation, air conditioning, or heat, leaving prisoners without fresh air and in extreme heat or cold.

22.     At all times material hereto, the vans used by PTS for transportation did not have seatbelts and/or PTS allowed prisoners to remain unseat-belted in the cages during travel.  This common practice leaves prisoners vulnerable to physical and emotional injury when agents subject the prisoners to "rough rides."

23.     The unnecessarily long, circuitous, zigzagging and/or indirect routes force prisoners to remain in the transport vehicles for days at a time, shackled at the feet, waist, and hands, without adequate ventilation or room to move and only the floor to sleep on.

24.     The transport agents assigned to drive the vans and guard the prisoners travel up to weeks at a time creating conditions that make it impossible for them to perform their duties safely or humanely.

25.     As a matter of policy, the corporate Defendants feed the prisoners the cheapest food possible (without regard to any special dietary restrictions or the medical needs of individual prisoners), and routinely withhold food and water to reduce the prisoners' need for the toilet in an effort to reduce the time of each trip.

26.     To cut expenses and increase profits, the corporate Defendants maintain a policy that limits the opportunity of the prisoners to sleep outside the transport vans, scheduling "rest overnight (RON)" stops every 48 to 72 hours, or more.

27.     PTS's travel policy with irregular intermediate stops denies prisoners, including the Plaintiff, the ability to stretch and move freely for unreasonably extended periods of time.

28.     To avoid the costs of paying intermediate jail facilities to allow prisoners to use restrooms, PTS tolerates prisoners urinating and defecating in the vans – in bottles, on themselves, and on the floors.  Prisoners, including the Plaintiff, were forced to remain in these unsanitary conditions for days at a time.

29.     Prisoners, like Plaintiff, do not leave the van when fed.  They remain shackled at the feet, with their wrists shackled to a waist chain, hunched over as much as possible to eat their meager meal among the filth of their own excrement.

30.     To avoid expenditures for medical treatment, the corporate Defendants ignore *bona fide* medical necessities that arise during transportation.  Refusing medical treatment allows the corporate Defendants to avoid time delays that affect their ability to schedule as many trips as possible in the shortest amount of time, and to avoid costs of treatment.  As a matter of policy, the corporate Defendants refuse to allow their agents to provide medical attention unless the condition is a matter of "life or death."  A former manager is quoted as saying, "Unless a medical condition is 'life or death,' [they] can't open the cage on the vehicle."  However, the corporate Defendants

have no established guidelines and fail to provide sufficient training to guide their agents to evaluate the severity of a medical condition or the need for treatment.

31.     At all times material hereto, PTS knew, or should have known, that its agents used rough rides (driving recklessly and erratically – tossing the prisoners about the cages) as a method of control or retaliation against prisoners, intending to frighten them when they complained about the conditions of their confinement.

32.     At all times material hereto, PTS knew, or should have known, that its agents withheld food and water from prisoners as a method of punishment, or to limit the need to use a toilet.

33.     The combination of all these practices and policies allows the corporate Defendants to spend the least amount of money, using the least number of employees and transport vans, in the least amount of time, to maximize profits.

**Inadequate Policies for Hiring, Training, Supervision and Discipline**

34.     PTS makes no meaningful or genuine effort to supervise, monitor, or evaluate its agents' treatment of prisoners, and routinely overlooks their agents' failure to comply with the written policies and procedures, including but not limited to, pre-trip procedures to ensure proper medical care or current medical conditions, documentation of incidents which occur during transportation that effect prisoners' safety and health; provision of medications; and provision of adequate sleep, rest, hygiene, toilet facilities and other basic human needs.

35.     PTS makes no genuine effort to enforce whatever policies or practices that do exist intended to protect prisoners from cruel and inhumane treatment during transportation.  Any such policies or claimed practices are illusory and mere window dressing.

36.     PTS fails to conduct meaningful investigations of known incidents of prisoner death and injury caused by the mistreatment or dangerous conduct of its agents.

37.    PTS purposely maintains policies, customs, or practices that it knew created unbearable working conditions that would result in transportation agents quitting after brief periods of time, unable to perform the job as PTS mandated, and unwilling to sacrifice their own safety.

38.    To save money, the corporate Defendants maintain a hiring policy that accepts extradition agents who do not possess the temperament or qualifications to safely transport the prisoners.   To control prisoners, the employees abuse the prisoners physically and verbally, intentionally over-tightening restraints; driving recklessly; withholding food and water; using racial epithets and other abusive language.

39.    The corporate Defendants fail to train their agents to properly provide medical care, safe transportation and prisoner rights, and/or have no meaningful or adequate methods of evaluating the training they do provide to ensure proficiency.  Training is limited mostly to review of policy paperwork or too brief tutorials – without testing or proficiency evaluation.

40.    PTS has no meaningful program of in-service training and no program of periodic job performance evaluations.   At all times material hereto, what meager training efforts that were implemented were haphazard at best and allowed transfer agents to feel comfortable in their ability to mistreat the prisoners, violating rights and laws without fear of repercussion.

41.    The corporate Defendants make little effort and routinely overlook their agents' failure to comply with the written policies and procedures, including but not limited to, pre-trip procedures and prisoner medical conditions; documentation of incidents which occur during transportation that effect prisoners' safety and health; provision of medications; and provision of adequate sleep, rest, toilet facilities and other basic human needs.

42.     The combination of all these practices and policies, acts and omissions, allows PTS to spend the least amount of money to transport the greatest number of prisoners in the least amount of time to maximize profits.

43.     This lack of supervision and oversight has resulted in a persistent and widespread pattern of abuse because the corporate Defendants' employees feel comfortable that they violate prisoners' rights without fear of discipline.

44.     The corporate Defendants' failure to properly train, supervise, and discipline its employees have resulted in practices and customs that can fairly be said to constitute official policy that denies federally protected constitutional rights and causes violations of tort laws.

45.     The corporate Defendants' policies are the direct cause of grossly inhumane conditions and treatment during transportation, resulting in an alarming number of injuries, assaults, and deaths.

**<u>Violations of Rights</u>**

46.     The interior of the vans used by the corporate Defendants are constructed with cages that resemble those used to control animals and make no accommodation for comfort or safety. The vans often have no rear windows and prisoners are left in complete darkness for days at a time.

47.     Prisoners are not provided adequate fresh air or ventilation, often sitting claustrophobically in extreme heat without air conditioning.

48.     Prisoners are not provided proper rest during transportation – denied the opportunity to sleep or even move for unreasonable periods of time or use a toilet.

49.     As a result, the transport agents instruct prisoners to urinate in empty cups and bottles while they remain shackled and handcuffed.  These receptacles are not regularly emptied

or removed from the cages, resulting in prisoners micturating where they sit, requiring that they spend long periods of time soaked in urine.

50.    Because regular toilet stops are not taken, prisoners often defecate where they are sitting, and because the van cages are not regularly cleaned along the transport route, they are routinely forced to sit in human waste — their own or that of other people in their cage — for the entire time that they are in transport.

51.    Prisoners are denied the opportunity for adequate hygiene, such as washing, showering, brushing their teeth, or changing their clothes.

52.    Prisoners are often denied adequate nutrition (quality or specialized diets), hydration (fresh water), medical care when needed, and proscribed medications.

53.    Transport agents use intimidation and violence against the prisoners as methods of control and retaliation if they object to the mistreatment, such as verbal threats and abuse; degrading language; use of restraints as weapons to inflict pain; denial of food, water and/or use of a toilet; and "rough rides" where the van is purposely driven recklessly to frighten or injure the prisoners.

54.    The Plaintiff alleges, and intends to prove, that at all times material hereto, the corporate Defendants knew, or reasonably should have known, of the widespread nature of these right and laws violations and refused to take action to correct them and, in fact, chose to permit them to continue because these policies were better for their business's bottom line.

55.    During Plaintiff's trip, the antifreeze used in the van began to leak, expelling high levels of freon vapors to permeate the van and which the Doe Defendants refused to repair.

56.    As a direct a proximate result of Plaintiff's exposure to these poisonous fumes, he suffered respiratory discomfort, cough, and lung irritation.

**Representations of Efficiency and the Myth of Equivalency**

57. PTS corporate Defendants were in the business and did provide extradition and transportation services for state and local governments, including sheriff's offices, police departments, state departments of correction, and other government agencies. To conduct these operations, the corporate Defendants assumed the color and duties of governmental authority.

58. PTS advertises that its services cost only a fraction of what it would cost official government agencies to transport prisoners. Yet, to fulfill that representation, the corporate Defendants do not transport prisoners in the same manner as official government agencies. It is a myth that PTS performs its transport services and treats prisoners in a manner similar to the official government agencies upon whose behalf they operate.

59. PTS advertises to prospective customers that its practices and policies emphasize the safety of prisoners as part of its operations. This is false.

60. The way PTS transports prisoners is dictated by policies that prioritize cost-saving measures over its obligation to transport prisoners safely, and to operate over-the-road transport vehicles safely. PTS policies, practices, and customs have predictably resulted in grossly unsafe, unsanitary, and inhumane conditions of confinement; a widespread pattern of injuries; medical emergencies and deaths; as well as very low agent retention rates; low job satisfaction; and hiring of unqualified agents.

**20-Case Sample of Injuries and Deaths**

61. BREVARD EXTRADITION SERVICES, LLC, U.S. CORRECTIONS LLC, along with a third sister subsidiary, *Prison Transportation Services of America, LLC,* operate under the umbrella of Prison Transportation Services LLC (PTS). The PTS subsidiaries operate without any detectable distinction from one another and lack any material individuality. The employees of each subsidiary are trained the same, work together, and supervise one another. The operations

12

of the subsidiaries are no different, and there does not appear to be any legitimate justification for the various incorporations other than to avoid public scrutiny.

### Tommy Lee Brenton

62.     In September 2009, Tommy Lee Benton was transported to Broward County Jail from Hernando (Fla.) County Jail in an 8-person van with 11 other prisoners. Shackled and chained he began to complain when he experienced trouble breathing. When he continued to complain after being told to stop, the van was pulled over and the agents removed him – dragging him to the ground – and kicking him as he lay on the hot pavement. Four years later, the case was settled for $60,012.00.

### Stephanie Luna

63.     In July 2013, Stephanie Luna was transported from Dallas to Houston. With temperatures outside the van in the 90's and Ms. Luna, shackled in a small sectioned off cage without a/c vents, became dehydrated and begged for water. The agents ignored her. Suffering heat exhaustion her nose began to bleed and she later experienced vaginal bleeding.

### Steven Galack

64.     In July 2012, Steven Galack was picked up in Florida for transportation to Butler County, Ohio. By the third day of the trip, in Georgia, with 10 other people in the van, he began to suffer heat related illness and became delusional. This led to him being removed from the van and stomped on by the guards. The supervising guard instructed "only body shots." Seventy miles later in Tennessee, Galack was found dead. The wrongful death lawsuit was settled.

### *William Culpepper*

65.   Galack's death was one of five known to have occurred on a van operated by a Prison Transportation Services (PTS) subsidiary. William Culpepper complained of stomach pain for a day and a half before dying of a perforated ulcer. Guards thought he was faking, so they ignored his pleas for medical care.

### *William Weintraub*

66.   In 2014, guards mocked William Weintraub, a physics professor, complained for days before he was found in the back of a van dead and covered in urine. He also died from a perforated ulcer.

### *Denise Isaacs*

67.   In 2014, Denise Isaacs, age 54, died in Miami onboard a van after she began acting bizarre and started drooling and gasping. The guards refused to take her to the hospital. Her autopsy later showed that she died from withdrawal from the anti-anxiety medication, diazepam, which guards were supposed to be giving her and were not.

### *Kevin Eli*

68.   In March of 2017, Kevin Eli was being transported from Virginia to Florida to face a nine-year-old burglary charge.  Handcuffed and shackled he began to complain about having trouble breathing.  When he refused to stop complaining he was put in a segregation cage. For the nest 30 minutes Mr. Eli pleaded with the guards to call 911.  Thinking he was faking, they refused. Mr. Eli died.  The death investigation also revealed he and other prisoners were also abused and denied basic human rights.  Women were found to be making tampons out of McDonald's wrappers, in front of the male prisoners, and urinating in plastic bottles with the tops cut off.

Prisoners reported being taken on joy rides at high speeds, sometimes crossing the median and knocking into road signs, as they were flung around in their cages.

### *Theresa Wrigley*

69.    Theresa Wrigley was on Eli's bus and watched him die.  Wigley, who has diabetes, was being transported from Wisconsin to Florida to face a charge of improperly using a company credit card.  She said that during her two-week journey, she was given her medication intermittently and fed only fast food and that she vomited repeatedly.

### *Lauren Sierra*

70.    In 2014, Lauren Sierra was repeatedly sexually assaulted by a U.S. CORRECTIONS extradition agent.

### *Joe Mondregon*

71.    In March of 2014, while being driven from New Mexico to Colorado, Joseph Mondragon claims that the guards burned his eye with a cigarette, repeatedly sprayed him with pepper spray, used a derogatory term for Latinos and forced him to sit in his own feces, urine and blood.

### *Tabitha Phelps*

72.    In June of 2014, Tabitha Phelps was being transported Joliet, Illinois to Winnebago County Jail in Wisconsin.  During the three-day trip, Phelps was forced to engage in sexual activities with the male inmates and with a PTS subsidiary guard as other extradition agents stood by watching.

*Roberta Blake*

73.     On August 26, 2014, Roberta Blake was picked up for transport from Ventura, California to Baldwin County, Alabama. Blake was handcuffed and shackled and put in a small sectioned off area in the van that had no air conditioning. She was denied her prescription medicine and medical care after losing consciousness several times.  During the trip, she was not seat-belted and was tossed about the van due to erratic driving by the guards.  Because the guards would not give restroom stops, Blake urinated herself and vomited on herself.  The agents permitted the male prisoners to reach into the cage area and rip off Blake's clothing and then the agents took pictures of her without clothing.  While in route she began menstruating, the guards refused her sanitary napkins, forcing her to use a McDonald's cup and napkins in front of other prisoners and the guards.

*Jeffrey Groover*

74.     In August of 2015, Jeffrey E. Groover, was picked up for transport at FCI Butner in North Carolina.  During the 52-hour road trip to Broward County, Groover was forced to sit in a "dog cage" as the van driver called it, which measured just 34 inches wide by 42 inches high. There was no air-conditioning and only one small vent.  The van rarely stopped for breaks. Groover was allowed just one cup of water and some food every eight hours.  After 24 hours into the trip, Groover suffered delusions and vomited.  The driver gave him an extra cup of water.  Groover suffered heat stroke.

*Darren Richardson*

75.     In 2015, Darren Richardson spent ten days in a van from Florida to Pikes County, Pennsylvania.  During that ten-day ride, the guards put a shotgun to his head, urinated on him, and

tried to extort his property.  The guards put him in a cage, with shackles so tight his legs, from the knees down, turned purple by the time the trip was over.

### *Serica Hadnot*

76.     In June 23, 2016, Serica Hadnot, pregnant, was being transported by from Hamilton County, Ohio to Marion County Indiana, a 100-mile trip that took 3-days. The extradition agents knew she was pregnant.  During the transport, Hadnot was shackled around her abdomen.  She became overheated numerous times, yet her requests for ventilation were ignored.  Male prisoners were urinating in plastic bottles and throwing the urine at her and other female prisoners.  PTS agents refused her water even though she was dehydrated.  The agents refused to give her pre-natal vitamins which they possessed.  When she began to bleed from the vagina, her request to go to the doctors were ignored.  As a result, Hadnot suffered a miscarriage.

### *Edward Kovari*

77.     On September 12, 2016, Edward Kovari was picked up in Winchester, Virginia for transport to Texas to face charges that he had stolen a car.  The charges would later be dismissed. During the trip, Kovari and other inmates, while always shackled, were forced to urinate in bottles, take turns sleeping on the van's floor, and watch as other inmates defecated and vomited in the van and then have to sit in it.  Like this case, Kovari was denied his medication and asked daily to go to the hospital but was denied.  When Kovari finally got to the Harris County, Texas jail, his systolic blood pressure was very high, and he was forced to stay in the jail infirmary for two days until his condition stabilized.

*Joseph Jackson*

78.     On June 30, 2016, Joseph Jackson was picked up in Bernalillo County New Mexico to be transported to Miller County, Arkansas.  Jackson was on medicine for high blood pressure.  The corporate Defendants' agents refused to fill his prescription.  With the high blood pressure, Jackson was to be on a low-sodium, fat-free diet.  However, the agents forced him to eat off the Dollar Menu at McDonalds. Jackson began experiencing visual interference, profuse sweating and lethargy.  Jackson's requests for medicine and alternative food were ignored.  Finally, Jackson lost consciousness in Texas and was hospitalized.

*Rajkumar Dhameja*

79.     From September 28 through October 7, 2016, Rajkumar Dhameja was transported in multiple vans from Los Angeles County Jail in California to Norfolk County Jail in Massachusetts.  During the trip, Mr. Dhameja was sadistically subjected to a litany of severe physical and psychological abuse during the transport.  The abuse included forcing him to sit and lie for extended periods in the festering human waste of himself and others; unreasonable tightening of the restraints on his wrists and legs for days for the sole purpose of inflicting pain; allowing 18 hours or more to elapse between restroom breaks even though the vans had no toilets; and failing to seatbelt him or any other people being transported while intentionally and violently swerving the van, accelerating, and slamming on the brakes to inflict pain and injuries on the helpless people inside.

*Hai Nguyen*

80.     In September of 2017, Mr. Nguyen was transferred from the New Jersey State Prison to the Sacramento County Jail in California.  During the trip, the van became so hot that prisoners began to complain by shouting and banging on the cages.  In response, the PTS agents drove the van recklessly

causing he and other prisoners to be tossed off the benches where they sat.  Before entering the van, Mr. Nguyen requested to be sea-t-belted in, but the agents ignored him.  During the "rough ride," Mr. Nguyen injured his lower back.  He requested medical treatment but was denied.  Mr. Nguyen's return trip was the same trip where Mr. Buck required emergency medical treatment.  During that rough ride, Mr. Nguyen suffered injury to his neck which will require surgery.

### *Luis Hernandez*

81.     On or about March 27, 2017, Luis Hernandez was taken into custody from a detention center in Redwood City, San Mateo County, California based on a 1998 warrant from Broward County, Florida.  Mr. Hernandez had numerous medical ailments requiring specific medications, including lisinopril, amlodipine, and metformin, without which he was in danger of stroke, heart attack, kidney failure, or death.  The normally 46 hours of travel to South Florida took over 230 hours -- nearly ten days.  Over the course of the transport, Mr. Hernandez was handcuffed, his legs were shackled, and he was confined to a steel bench on one side of the van.  He was unable to stretch or straighten his legs during the transport because the steel divider was positioned directly in front of him. With barely any room for his shackled legs, his knees would repeatedly hit against the divider. He was also forced to lean forward in his seat so his head would not strike the top of the van. Mr. Hernandez remained in this same position, without being able to move, walk, or stand, for as many as 12 continuous hours at a time.  His wrists and ankles became severely swollen and his legs completely numb. Mr. Hernandez informed the agents that he was in pain; however, they ignored his complaints.  Due to not receiving his medications, Mr. Hernandez became ill, disoriented, and developed diarrhea, forcing him to defecate on himself in the van.  The van was not stopped to allow him to clean himself.   On another occasion, an individual got sick and vomited in the back of the van.  Again, the van was not stopped to clean the mess and Mr. Hernandez was forced to spend days sitting in vomit and his own human waste.  Mr. Hernandez

was only allowed to shower on two occasions during the ten-day transport.  Mr. Hernandez began to become increasingly sick. Once Mr. Hernandez arrived in Fort Lauderdale, Florida, wrist surgery and emergency treatment in the hospital were required to stabilize his condition

82.     These instances, and many others, establish a policy of deliberate indifference that is so bereft of compassion that it disregards sexual abuse, encourages physical abuse leading to death, and appears to adopt emotional trauma as a means of control.

83.     Pursuant to the corporate Defendants' policies, customs and practices, described herein, as carried out by their employees, Plaintiff NGUYEN was subjected to grossly unsanitary and unsafe conditions of confinement, suffered physical and emotional injury, was denied medical care and basic human needs.

### THE TRIP: From New Hampshire to Wisconsin

84.     On or about July 20, 2018 the Plaintiff was picked up by the corporate Defendants' extradition agents for transport from Keene County, New Hampshire to Wood County, Wisconsin to resolve an outstanding charges.  The transport agents who took custody of the Plaintiff were Does #1 and #2.

85.     Plaintiff was placed in a small cargo van, unequipped with a toilet, in full shackles, which included leg irons and handcuffs locked to waist chains.

86.     During most of the entire trip, until July 25, 2018, the van was driven in a manner that was in reckless disregard for the safety of the human passengers.

87.     After leaving Keene County, for the next eight hours, the Doe Defendants forced the Plaintiff and other prisoners to remain locked in the cage without a restroom break.  During this time, prisoners were forced to urinate in plastic bottles and if necessary, defecate in the van, on

themselves, and onto the floors, creating unsanitary conditions from which the Plaintiff could not escape.

88.     For much of the trip, the antifreeze in the cargo van transporting the Plaintiff and others was leaking.  During this time, the Plaintiff became overwhelmed by the conditions.  The level of poisonous fumes permeating the van was extremely high and intolerable.

89.     As a result of the Doe Defendants' initially refusing to repair the leaking Freon, the Plaintiff suffered nausea, respiratory discomfort, lightheadedness, and cough.  Plaintiff was forced to endure these dangerous and deplorable conditions for a period of at least 48 to 72 hours until the Doe Defendants finally fixed the Freon leak by adding water to the radiator.

90.     At one juncture during the trip, the Plaintiff spent four full days in the van without a Rest Over Night, eating fast food, drinking little water, receiving few bathroom breaks, all in violation of PTS policy.

91.     In addition to the depravation of the most basic human rights (denying dignity and causing fear and mental distress), Plaintiff's physical and emotional injuries were directly caused by the corporate Defendants' callous disregard and lack of appropriate management; manifesting from faulty written policies, lack of established policy, failure to follow written policies, and insufficient training and performance programs.

92.     The primary purpose of the corporate Defendants' operations is to serve a public function -- to safely transport incarcerated persons long distances to and from jail to jail.

93.     Acting under the color of law, with governmental authority, the corporate Defendants have public duties stemming from the Eighth Amendment and made applicable by the Fourteenth Amendment.

94.     The Defendants, in their role as extradition agents and jailers, have complete care, custody, and control of the prisoners and, therefore, must operate lawfully; with their primary focus

being the constitutional rights and laws intended to protect the safety and well-being of the prisoners.

95.     Such is the case with the departments of detention division of every law enforcement agency upon whose behalf the corporate Defendants serve and, therefore, must be the primary objective of the corporate Defendants as well.

96.     However, the corporate Defendants routinely and systematically ignore the safety and wellbeing of the prisoners they transport with the unifying thread throughout the facts as they occurred to the Plaintiff, and scores of others, being the corporate Defendants' placement of its corporate interests above that primary purpose.

97.     As a direct and proximate result of the cruel and inhumane treatment inflicted by the Defendants, the Plaintiff continues to suffer from post-traumatic stress, including but not limited to starvation; insomnia; excessive heat exposure and dehydration; anxiety; sleeplessness; respiratory illness, depression; and frustration.

### *FEDERAL CAUSES OF ACTION*

### Count I
### 42 U.S.C. §1983 Claim
### (PTS Defendants)

98.     Plaintiff hereby incorporates paragraphs 1 through 97 above, as if specifically set forth herein.

99.     At all times material hereto, the PTS Defendants acted under the color of governmental authority and law in performing functions traditionally reserved to the state, namely the extradition and transport of prisoners and pretrial detainees.  Therefore, PTS is a state actor and subject to the same laws and rules applicable to any governmental entity, including 42 U.S.C. § 1983.

100.   While PTS is not vicariously liable for its employees' violations of civil rights, they are liable for their policies (or practices and customs that have the force of policy) that allow abuses to occur because the policies encourages a culture that, once entrenched, can rarely be corrected without fundamental change.

101.   At all times material hereto, PTS knew, or reasonably should have known, of numerous deaths and significant injuries that occurred as a result of established customs and practices that dictated the manner in which they operated and, therefore, had the equivalency of corporate policy.

102.   At all times material hereto, PTS knew, or reasonably should have known, that their adopted policies violated basic human rights constituting cruel and unusual punishment, and that injury to the Plaintiff was foreseeable.

103.   At all times material hereto, PTS remained deliberately indifferent to the foreseeability of injury to the Plaintiff and other prisoners.

104.   As a direct and proximate result of its policies, PTS subjected the Plaintiff to overcrowded, unsanitary, and unsafe conditions of confinement and exposure to poisonous fumes a prolonged time, starvation, insomnia, excessive heat exposure, and dehydration, causing physical and emotional injury that continue now and will continue in the future.

105.   These policies, express and implied, exist across operations of PTS and all its subsidiaries, and are the "moving force" of Plaintiff's damages.

**WHEREFORE**, the Plaintiff, CHRISTOPHER BENSON requests this Court to enter judgment against Defendant, PTS and/or its subsidiaries, and award the Plaintiff compensatory and punitive damages, as well as costs and attorney fees pursuant to 42 U.S.C §1988, and all other further relief this Court deems just and proper.  Plaintiff demands trial by jury for all issues so triable by right.

### Count II
### 42 U.S.C. §1983 Claim
### (JOHN DOE DEFENDANTS 1 AND 2)

106.    Plaintiff hereby incorporates paragraphs 1 through 97 above, as if specifically set forth herein.

107.    At all times material hereto, each Doe Defendant was a state actor and subject to same laws and rules applicable to any official government actor, including the Eight Amendment and 42 U.S.C. § 1983.

108.    As stated with particularity above, Doe #1 and #2, as the Plaintiff's jailers, each inflicted cruel and unusual punishment upon the Plaintiff by denying him basic human rights, subjecting him to injury and needless abuse.

109.    Defendants Doe #1 and #2 deprived Plaintiff of basic human needs causing injury. which they themselves caused over the course of two transportations.

110.    As a direct and proximate result of these constitutional deprivations, the Plaintiff was subjected to overcrowded, unsanitary, and unsafe conditions of confinement and was denied food and water for a prolonged time; exposed to poisonous fumes causing him physical injury; as well as starvation; insomnia; excessive heat exposure; and dehydration, resulting in  permanent physical and emotional injury that continues now and will continue in the future.

**WHEREFORE**, the Plaintiff CHRISTOPHER BENSON, seeks judgment of this Honorable Court against Defendants, DOE #1 and DOE #2, awarding the Plaintiff compensatory and punitive damages, as well as costs and attorney's fees pursuant to 42 U.S.C §1988, and all other further relief this Court deems just and proper.  Plaintiff demands trial by jury for all issues so triable by right.

### STATE TORTS

### Count III
### Breach of Duty - Negligent Training
### (PTS Defendants)

111.    Plaintiff hereby incorporates paragraphs 1 through 97 above, as if specifically set forth herein.

112.    A source and cause of the abuse and injury suffered by the Plaintiff and others was inadequate training and evaluation.

113.    To the extent that these deficiencies in training and evaluation resulted in abuses by the Doe Defendants, intended to serve their own individual objectives in controlling the Plaintiff and other prisoners, such as "rough rides," threats of physical violence, and verbal abuse, and exposure to poisonous fumes, which did not serve their employers' interests, PTS breached a duty to properly train the Doe Defendants, and properly evaluate the effectiveness of that training.

114.    Based on the widespread abuses that were taking place, up to and including the time Plaintiff was injured, PTS knew, or reasonable should have known, that its training and evaluation programs were deficient but failed to correct them.

115.    These failures constituted a breach of duty by PTS, undertaken as a common carrier of incarcerated prisoners, to properly train and evaluate its transportation agents.

116.    As such, the PTS corporate Defendants' breach of that duty was a direct and proximate cause of the physical and emotional injuries and pain and suffering that befell upon the Plaintiff at the hands of the Doe Defendants.

117.    As a direct and proximate result of these constitutional deprivations, the Plaintiff was subjected to overcrowded, unsanitary, and unsafe conditions of confinement and was denied food and water for a prolonged time; exposed to poisonous fumes causing him physical injury; as well as starvation; insomnia; excessive heat exposure; and dehydration; resulting in permanent physical and emotional injury that continues now and will continue in the future.

**WHEREFORE,** the Plaintiff, CHRISTOPHER BENSON, seeks judgement of this Honorable Court against the PTS Defendants, awarding him compensatory and punitive damages, and such other relief as the Court deems just and proper. The Plaintiff seeks trial by jury for all causes of action so triable.

<u>**Count IV**</u>
<u>**Breach of Duty – Negligent Supervision**</u>
**(PTS Defendants)**

118.    Plaintiff hereby incorporates paragraphs 1 through 97 above, as if specifically set forth herein.

119.    A source and cause of the abuse and injury suffered by the Plaintiff and others was inadequate supervision.

120.    To the extent that these deficiencies in supervision resulted in abuses by the Doe Defendants intended to serve their own individual objectives in controlling the Plaintiff and other prisoners, such as "rough rides," threats of physical violence, and verbal abuse, and exposure to poisonous fumes, which did not serve their employers' interests, the corporate Defendants breached a duty to properly supervise Does #1 - #2, to prevent physical and emotional injury.

121.    Based on the wide-spread abuses that were taking place, up to and including the time Plaintiff was injured, the corporate Defendants knew, or reasonable should have known, that their supervision policies were deficient but failed to correct them.

122.    These failures constituted a breach of duty by the PTS Defendants, undertaken as a common carrier of incarcerated prisoners, to properly supervise its transportation agents.

123.    As such, the PTS Defendants' breach of that duty was a direct and proximate cause of the physical and emotional injuries and pain and suffering that befell upon the Plaintiff at the hands of Doe Defendants.

124.    As a direct and proximate result of these constitutional deprivations, the Plaintiff was subjected to overcrowded, unsanitary, and unsafe conditions of confinement and was denied

food, and water for a prolonged time, exposed to poisonous fumes causing him physical injury, as well as starvation, insomnia, excessive heat exposure, and dehydration, resulting in permanent physical and emotional injury that continues now and will continue in the future.

**WHEREFORE,** the Plaintiff, CHRISTOPHER BENSON, seeks judgement of this Honorable Court against the PTS Defendants, awarding him compensatory and punitive damages, and such other relief as the Court deems just and proper.  The Plaintiff seeks trial by jury for all causes of action so triable.

**Count V**
**Breach of Duty - Negligent Retention**
**(PTS Defendants)**

125.    Plaintiff hereby incorporates paragraphs 1 through 97 above, as if specifically set forth herein.

126.    A source and cause of the abuse and injury suffered by the Plaintiff and others was knowing retention of transport agents who were dangerous.

127.    To the extent that the corporate Defendants' willingness to retain agents who pose a risk to the prisoners resulted in abuses by Does #1 and #2, which were intended to serve their own individual objectives in controlling the Plaintiff and other prisoners, such as "rough rides," threats of physical violence, and verbal abuse, which did not serve their employers' interests, the corporate Defendants breached a duty to properly discipline and terminate Does #1 and #2, to prevent physical and emotional injury.

128.    Based on the widespread abuses that were taking place, up to and including the time Plaintiff was injured, the PTS Defendants knew, or reasonable should have known, that their retention policies were deficient but failed to correct them.

129.    These failures constituted a breach of duty by the corporate Defendants, undertaken as a common carrier of incarcerated prisoners, to properly supervise its transportation agents.

130.    As a direct and proximate result of these constitutional deprivations, the Plaintiff was subjected to overcrowded, unsanitary, and unsafe conditions of confinement and was denied food, and water for a prolonged time, exposed to poisonous fumes causing him physical injury, as well as starvation, insomnia, excessive heat exposure, and dehydration, resulting in permanent physical and emotional injury that continues now and will continue in the future.

**WHEREFORE,** the Plaintiff, CHRISTOPHER BENSON, seeks judgement of this Honorable Court against the PTS Defendants, awarding him compensatory and punitive damages, and such other relief as the Court deems just and proper. The Plaintiff seeks trial by jury for all causes of action so triable.

<u>**Count VI**</u>
<u>**Intentional Infliction of Emotional Distress - State Tort Claim**</u>
**(PTS Defendants)**

131.    Plaintiff hereby incorporates paragraphs 1 through 97 above, as if specifically set forth herein.

132.    To the extent the malign acts of the Doe Defendants were committed in furtherance of the PTS corporations' interests (such as unnecessarily long, indirect routes, deprivation of sleep, rest, comfort, unsanitary conditions, refusing to administer medicine, rushing Plaintiff's hospital care, and more, as alleged above) the corporate Defendants are vicariously liable.

133.    Plaintiff alleges that these malign acts were extreme and outrageous, violating norms of decency in a civilized society – even more so where the agents took advantage of the Plaintiff's vulnerability as a helpless prisoner – and wholly unjustified even in performing the services under difficult circumstances.

134.    Abuse of power is a significant factor in the calculus of infliction of emotional distress.

135.    As a direct and proximate result of these constitutional deprivations, the Plaintiff was subjected to overcrowded, unsanitary, and unsafe conditions of confinement and was denied food, and water for a prolonged time, exposed to poisonous fumes causing him physical injury, as well as starvation, insomnia, excessive heat exposure, and dehydration, resulting in  permanent physical and emotional injury that continues now and will continue in the future.

**WHEREFORE,** the Plaintiff, CHRISTOPHER BENSON, seeks judgement of this Honorable Court against the PTS Defendants, awarding him compensatory and punitive damages, and such other relief as the Court deems just and proper.  The Plaintiff seeks trial by jury for all causes of action so triable.

DATED this 18th day of May, 2020.

/s/ *David A. Frankel*
DAVID A. FRANKEL
**Law Offices of David A. Frankel, P.A.**
4601 Sheridan Street, Suite 213
Hollywood, FL 33021
(954) 683-0300
David@BlueLotusLaw.com
eService@BlueLotuslaw.com
FLA. BAR NO. 741779